# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KELLI FIELDS,
      Plaintiff

  vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:09-cv-273

Spiegel, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner): (1) finding plaintiff was no longer entitled to disability insurance benefits (DIB) and supplemental security income (SSI) as of May 1, 2005, and (2) denying plaintiff's new applications for DIB and SSI. This matter is before the Court on plaintiff's Statement of Errors (Doc. 27) and the Commissioner's response in opposition (Doc. 32).

## I. Procedural Background

Plaintiff was previously found disabled and granted DIB and SSI with a disability onset date of February 1, 1999, following a hearing before administrative law judge (ALJ) John T. Kelly, III, in October 2000. In a decision dated November 22, 2000, ALJ Kelly found that plaintiff was unable to perform substantial gainful activity due to severe hepatitis A, B and C with resulting fatigue and right upper quadrant pain; low back pain, right hip pain, right leg pain and neck pain; and a depressive disorder. (Tr. 31-38).

The Social Security Administration (SSA) subsequently determined that plaintiff's disability ceased as of May 1, 2005. (Tr. 40-41). Plaintiff's request for reconsideration of that

decision was denied. Plaintiff requested and was granted a hearing before ALJ Larry Temin on June 12, 2008, at which she appeared with counsel. (Tr. 980-1011). On July 25, 2008, the ALJ issued a decision that medical improvement occurred as of May 1, 2005, and that the medical improvement was related to the ability to work; plaintiff was able to perform a significant number of jobs in the national economy as of May 1, 2005; and her disability ended as of that date. (Tr. 524-30). Plaintiff's request for review was denied by the Appeals Council, making the decision of the ALJ the final decision of the Commissioner.

Plaintiff appealed ALJ Temin's July 25, 2008 decision to this Court. (Doc. 3). In June 2009, pursuant to the Commissioner's request, the Court remanded the matter to the Social Security Administration to obtain missing evidence and to allow plaintiff the opportunity to offer any additional evidence in connection with a new hearing. (Doc. 6).

In the interim, plaintiff filed new applications for DIB and SSI on March 2, 2009. (*See* Tr. 9). A combined hearing on the cessation of benefits and on the new applications was held before ALJ Temin on July 19, 2010. (Tr. 1014-1035). Plaintiff appeared with counsel, and a vocational expert (VE) also testified at the hearing. ALJ Temin issued a decision on August 25, 2010, in which he again found that plaintiff's disability had ceased as of May 1, 2005 and that plaintiff had not become disabled again since that date. (Tr. 6-27). Plaintiff's request for review was once more denied by the Appeals Council, making the decision of the ALJ the final decision of the Commissioner.

## II. Applicable Law

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

2

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *White v. Commissioner of Social Sec.,* 572 F.3d 272, 281 (6th Cir. 2009) (citing *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Commissioner Social Sec. Admin.,* 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen,* 478 F.3d at 746). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004).

When, as here, a recipient of disability benefits challenges the cessation of benefits, the central issue is whether the recipient's medical impairments have improved to the point where she is able to perform substantial gainful activity. 42 U.S.C. § 423(f)(1); *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007). Whether an individual's entitlement to benefits

3

continues depends on whether "there has been any medical improvement in [the individual's] impairment(s) and, if so, whether this medical improvement is related to [the individual's] ability to work." 20 C.F.R. §§ 404.1594(b), 416.994(b).

The cessation evaluation process is a two-part process. *See Kennedy*, 247 F. App'x at 764-65. The first part of the process focuses on medical improvement. *Id.* at 764. The implementing regulations define "medical improvement" as "any decrease in the medical severity of [the individual's] impairment(s) which was present at the time of the most recent favorable medical decision that [the individual was] disabled or continued to be disabled." *Id.* at 764-65 (citing 20 C.F.R. § 404.1594(b)(1)). "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the individual's] impairment(s). . . . 20 C.F.R. §§ 404.1594(b)(1)(i), 416.994(b)(1)(i). If there has been a decrease in the severity of the impairments since the favorable decision, the medical improvement is related to the individual's ability to work only if there has been a corresponding 'increase in [the claimant's] functional capacity to do basic work activities. . . .'" *Kennedy*, 247 F. App'x at 765 (quoting 20 C.F.R. § 404.1594(b)(3)). *See also Nierzwick v. Commissioner of Social Security*, 7 F. App'x 358, 361 (6th Cir. 2001).

Medical improvement is "determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)." 20 C.F.R. §§ 404.1594(b)(2), 416.994(b)(2). Under Sixth Circuit law, the date of the most recent ALJ hearing, not the cessation of benefits date, is the relevant point of comparison for determining medical

4

improvement subsequent to the initial award. *Difford v. Secretary of Health & Human Services,* 910 F.2d 1316, 1320 (6th Cir. 1990). That is, the ALJ must consider the plaintiff's condition at the time of the ALJ hearing and if the evidence shows she was disabled as of that date, her benefits should continue even if she was not disabled as of the cessation date. *McNabb v. Barnhart,* 340 F.3d 943, 944 (9th Cir. 2003) (citing *Difford,* 910 F.3d at 1319-20).

The second part of the cessation analysis focuses on whether the individual has the ability to engage in substantial gainful activity. *Kennedy,* 247 F. App'x at 765. The implementing regulations for this part of the evaluation incorporate many of the standards set forth in the regulations that govern initial disability determinations. *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7)). The difference is that "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7); *Griego v. Sullivan,* 940 F.2d 942, 944 (5th Cir. 1991)). An increase in the claimant's functional capacity will lead to a cessation of benefits only if, as a result, the claimant can perform her past work or other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1594(f)(7), (8), 416.994(f)(7), (8).

In deciding whether a recipient's entitlement to disability benefits has ended, the Commissioner uses the eight-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1594(f)(1)-(8) and 416.994(f)(1)-(8). *Kennedy,* 247 F. App'x at 764. The steps are:

> (1) Are you engaging in substantial gainful activity? If you are . . . we will find disability to have ended . . . .

> (2) If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.

(3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? . . . .

(4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section. . . .

(5) If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. . . .

(6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe. . . .

(7) If your impairment(s) is severe, . . . we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

(8) If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment. . . . If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.

20 C.F.R. §§ 404.1594(f), 416.994(f).

There is no presumption of continuing disability. *Kennedy*, 247 F. App'x at 764

(citing *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286-287 n. 1 (6th Cir.

1994)). Instead, the Commissioner applies the above procedures to determine whether the

claimant's disability has ended and if she is now able to work. *Id.*

### III. The ALJ Decisions

#### A. The initial ALJ decision

In a decision dated November 22, 2000, ALJ Kelly found that plaintiff, who was 41

years old at the time, had severe hepatitis A, B and C, and that she experienced fatigue and

right upper quadrant pain as a result; she had also received treatment for low back pain, right

hip pain, right leg pain, and neck pain; and she had been diagnosed with a depressive disorder.

(Tr. 37). ALJ Kelly found that plaintiff had been diagnosed with hepatitis A, B and C in June

1998 based on a liver biopsy; in August 1998, she began Interferon treatments three times per

week; in February 1999, she was admitted to a hospital with a complaint of pain in the right

liver area; she was hospitalized due to symptoms of hepatitis in March, April and May of

1999; since May of 2000, she had been treated at a facility due to complaints of low back pain,

right hip pain, right leg pain, and neck pain; and she had been admitted to a pain clinic due to

chronic right upper quadrant pain stemming from her hepatitis. (Tr. 36).

The ALJ further found that plaintiff suffered from depression. He noted that in

October 1999, she was hospitalized due to depression secondary to her general medical

condition and was assigned a GAF score of 52[1], and in February and May 2000 she was again

hospitalized due to her depressive disorder. (*Id.*).

The ALJ stated that the severity of plaintiff's hepatitis and associated symptoms may

meet or medically equal Listing 5.05, but the testimony of a medical expert would be required

to establish this. The ALJ decided not to obtain such testimony because he determined

plaintiff was clearly disabled at step five of the sequential evaluation process. (*Id.*).

The ALJ determined that considering plaintiff's testimony in view of her frequent

---

[1] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 51-60 as having "moderate" symptoms. *Id.* The next higher category, for scores of 61 to 70, refers to an individual with "some mild" symptoms who is "generally functioning pretty well." *Id.*

hospitalizations and treatment, she would be absent from work two to three days a month. (*Id.*). The ALJ found based on plaintiff's testimony and the objective medical evidence that due to symptoms of fatigue, chronic pain and depression leading to diminished stamina and endurance, plaintiff "lack[ed] the persistence to effectively perform any type of job in the competitive economy during the course of [a] five-day, forty-hour workweek." (*Id.*).

### B. The August 25, 2010 ALJ decision

The most recent ALJ decision was issued by ALJ Temin on August 25, 2010, following a hearing held on July 19, 2010. (Tr. 9-27). ALJ Temin made the following findings:

> 1. The most recent favorable medical decision finding that the claimant was disabled is the decision dated November 22, 2000. This is known as the "comparison point decision" or CPD.
>
> 2. At the time of the CPD, the claimant had the following medically determinable impairments: Hepatitis A, B and C, a depressive disorder, and musculoskeletal pain. These impairments were found to result in the residual functional capacity that functionally precluded her from engaging in even a full range of sedentary work on a sustained basis [Tr. 37[2]].
>
> 3. As of May 1, 2005, the date the claimant's disability ended, the claimant had not engaged in substantial gainful activity (20 CFR 404.1594(f)(1)).
>
> 4. The medical evidence establishes that, since May 1, 2005, the claimant had the following medically determinable impairments: chronic hepatitis C; degenerative disc disease of the lumbar spine with spondylosis; mild chronic obstructive pulmonary disease (COPD); depression; anxiety. These are the claimant's current impairments.
>
> 5. Since May 1, 2005, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment

---

[2]ALJ Kelly determined that plaintiff was "functionally precluded from engaging in any substantial gainful activity, including a full range of sedentary work, on a sustained basis due to her combined impairments and associated symptoms and limitations." (Tr. 37).

listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

6. Medical improvement occurred as of May 1, 2005 (20 CFR 404.1594(b)(1) and 416.994(b)(1)(i)).

7. As of May 1, 2005, the impairments present at the time of the CPD had decreased in medical severity to the point where the claimant had the residual functional capacity to perform the following: lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; occasionally stoop, kneel, crouch, and climb ramps and stairs; no crawling or climbing ladders, ropes or scaffolds; no work at unprotected heights; remember and carry out only short and simple instructions; no interaction with the general public, and no more than occasional interaction with coworkers or supervisors; no more than ordinary and routine changes in the work setting or duties; no more than simple work-related decisions.

8. The claimant's medical improvement is related to the ability to work because it has resulted in an increase in the claimant's residual functional capacity (20 CFR 404.1549(c)(3)(ii) and 416.994(b)(2)(iv)(B)).

9. Beginning on May 1, 2005, the claimant has continued to have a severe impairment or combination of impairments (20 CFR 404.1594(f)(6) and 416.994(b)(5)(v)).

10. Beginning on May 1, 2005, based on the current impairments, the claimant has had the residual functional capacity to perform the following: lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight-hour workday; occasionally stoop, kneel, crouch, and climb ramps and stairs; no crawling or climbing ladders, ropes or scaffolds; no work at unprotected heights; no concentrated exposure to fumes, noxious odors, dusts or gasses; remember and carry out only short and simple instructions; no interaction with the general public, and no more than occasional interaction with coworkers or supervisors; no more than ordinary and routine changes in the work setting or duties; no more than simple work-related decisions.

11. Beginning on May 1, 2005, the claimant has been unable to perform past relevant work (20 CFR 404.1565 and 416.965).

12. On May 1, 2005, the clamant was a younger individual age 18-49. Since attaining age 50, the claimant has been classified as an "individual closely approaching advanced age" for Social Security purposes (20 CFR 404.1563

and 416.963).

13. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

14. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

15. Beginning on May 1, 2005, considering the claimant's age, education, work experience, and residual functional capacity based on the current impairments, the claimant has been able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

16. The claimant's disability ended on May 1, 2005, and the claimant has not become disabled again since that date (20 C.F.R. 404.1594(f)(8) and 416.994(b)(5)(vii)).

(Tr. 11-26).

## IV. Medical Evidence

### A. Physical Impairments

Plaintiff was seen at the Veterans Administration (VA) Medical Center for a routine clinic visit in June 2003. (Tr. 277-78). The impression was chronic left shoulder pain with recent worsening; history of hepatitis C with chronic right upper quadrant pain; history of seasonal allergies; and weight gain and fatigue, rule out thyroid disease. (Tr. 278). A GI clinic consult was ordered for evaluation of PEG therapy[3]. (Tr. 278).

In November 2003, plaintiff was seen for follow-up of active hepatitis C with chronic liver enzyme elevation. (Tr. 230). Plaintiff had chronic right upper quadrant tenderness and

---

[3]Peginterferon is an injectable drug used for treating chronic hepatitis infections.
http://hepatitis.about.com/od/treatment/p/Peginterferon.htm.

continued to drink about a "six-pack" per week despite knowing she had hepatitis C. She was instructed in a phone call to stop drinking before she could be seen in the hepatitis C clinic.

Records from July 2004 noted continued consumption of a "six-pack" per week despite knowledge of her hepatitis C. (Tr. 265). Objective findings included chronic right upper quadrant tenderness, with an ultrasound of the abdomen from March 2004 showing a non-enlarged liver and changes suggestive of chronic hepatitis. (Tr. 266). The impression was chronic hepatitis C with liver enzyme elevation and hypertension. Plaintiff was strongly advised against further alcohol use and was to return to the clinic for her next routine visit in three months. (*Id.*).

In November 2004, plaintiff reported back pain and pain in the right liver area for which she took Oxycodone. (Tr. 261).

In May 2005, plaintiff was seen in the hepatitis C clinic for a work-up. (Tr. 226).

A July 2005 ultrasound of the abdomen was normal (Tr. 213) and treatment notes showed plaintiff's liver enzymes had improved but were still elevated. (Tr. 252). Plaintiff admitted to continued alcohol use.

Notes from October 2005 reflect plaintiff complained of great fatigue and anhedonia. She continued to drink alcohol despite knowledge of her hepatitis C, but agreed to stop drinking as she realized it was contraindicated by her hepatitis. (Tr. 245, 248). She also reported chronic right flank and right upper quadrant pain. (Tr. 248).

A CT scan of the abdomen performed on November 15, 2005, showed diffuse fatty infiltration of the liver with dilatation of the common bile duct. (Tr. 211A).

In August 2006, plaintiff complained of chronic low back and bilateral shoulder pain

11

for which she was taking methadone and percocet. (Tr. 403). She reported adequate pain relief and ambulated with a steady gait. (Tr. 405). The review of systems included minimal joint pain, insomnia, and depression/anxiety. (Tr. 407). As of that date, plaintiff had completed 12 weeks of PEGinterferon therapy but had missed a few injections. (Tr. 408).

On October 31, 2006, plaintiff called the VA clinic and spoke with a physician's assistant whose notes document that plaintiff stated she had been afraid to come back to the VA Medical Center since her providers there had stopped her pain medications (oxycodone and valium) due to her ethanol level. (Tr. 399-400). Plaintiff stated she had not come back to the VA and had missed her hepatis C labwork because she had bought some oxycodone on the street and was afraid it would show up in her labwork. She was encouraged to keep her next appointment and to take her last interferon injection as planned.

On November 13, 2006, plaintiff was seen at the VA Medical Center for a routine follow-up visit. (Tr. 395-399). It was noted she ambulated with a steady gait. (Tr. 398). Plaintiff reported a pain level of 5 in both shoulders and in the right side but denied any other health concerns. (*Id.*). The examining physician, Dr. Chinnappan, noted that her past medical history was positive for chronic multiple arthralgias in the right shoulder, knees, right lower rib cage and low back; hepatitis C which was being treated and followed by the hepatitis C clinic; and a history of pain under the right upper rib cage. (Tr. 395-96). Dr. Chinnappan noted that plaintiff tested positive for alcohol and had been taken off narcotic medications (methadone and percocet) for a period of six months. (Tr. 396). Physical examination revealed tenderness in the right upper quadrant and epigastrium, pain on range of motion as well as in the AC joint, no swelling in the knees, and no tenderness. Dr. Chinnappan

12

diagnosed plaintiff with gastroesophageal reflux disease, chronic pain syndrome, hepatitis C, hypertension, and alcohol use.

A note dated December 26, 2006, stated that plaintiff did not keep her last appointment and indications were after 24 weeks of therapy her hepatitis had not responded to the medication. (Tr.  400).

Plaintiff was seen at the VA Medical Center in February, March, June, and September 2007 for hypertension (controlled), chronic back pain, hepatitis that was unresponsive to treatment, fatty liver, and tobacco disorder.  (Tr. 393-95; Tr. 391-92A; Tr. 380; Tr. 377-78).

Plaintiff received chiropractic treatment from February through April of 2008 for pain. (Tr. 492-509).  By her last visit she had made some improvement and had entered a subacute phase. (Tr. 509).  Plaintiff subsequently treated with a chiropractor, Dr. James Hamlin, in April  2008 for what appears to be left leg and left arm pain.[4]  (Tr. 755-761).

An MRI of the lower back performed on March 10, 2008, showed "minor degenerative disc disease." (Tr. 316).   X-rays that same date showed no interval change from spondylosis and degenerative sclerosis of the L3 vertebrae seen in 2006.  (Tr. 316).

VA Medical records in April 2008 revealed an assessment of hypertension, tobacco use disorder, history of alcoholism, osteoarthritis, hepatitis C, hyperlipidemia, and "white coat syndrome.[5]"  (Id.).  Plaintiff reported she had not used any alcohol for about four months.

On June 27, 2008, plaintiff's treating physician at the VA Medical Center, Dr.

---

[4]Dr. Hamlin's notes are not entirely legible.

[5]"White coat syndrome" is a condition wherein the individual demonstrates elevated blood pressure in a clinical setting, and not in other settings, due to anxiety and apprehension about visiting the clinic. http://www.whitecoatsyndrome.org/.

Chinnappan, completed a Medical Assessment of Ability to Do Work-Related Activities. (Tr. 516-18). He indicated that plaintiff could lift 5 pounds for less than 1 hour in an 8-hour workday; she could stand and walk a total of 2 hours in an 8-hour workday and for 1 hour without interruption; she could sit a total of 2 hours in an 8-hour workday and 15 to 20 minutes without interruption; she could balance frequently; she could never climb, stoop, crouch, kneel or crawl; reaching and pushing/pulling were affected; and she was restricted from heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibrations.

Notes from June 2008 showed plaintiff ambulated independently "with a good steady gait." (Tr. 647). Plaintiff complained of lower back and right-sided pain which she rated as 2/10. (*Id.*).

On July 23, 2008, plaintiff was seen for foot pain and was diagnosed with Morton's metatarsalgia. (Tr. 638-39). An August 2008 addendum noted x-rays were negative for osseous forefoot pathology and an EMG was normal. (*Id.*).

On June 30, 2009, consultative examining physician Dr. William Padamadan, M.D., examined plaintiff and prepared a report. (Tr. 696-709). Dr. Padamadan diagnosed plaintiff with COPD, "Hepatitis C treated," and "[l]ow back pain without objective findings or functional impairment." (Tr. 697). Dr. Padamadan found that the length of treatment of 1½ years was unusual for hepatitis but nonetheless found there was "no clinical stigmata of liver disease of significance." (Tr. 698). He found that plaintiff would need restrictions against dust, fumes, and inhalant irritants and may need restrictions against prolonged walking, frequent climbing of poles and ladders, and repetitive physical activities based on her smoking

14

2 packs of cigarettes a day. (*Id.*).

On July 27, 2009, Dr. Chinnappan reported that plaintiff had an enlarged liver and that chronic hepatitis changes were seen in the liver parenchyma. (Tr. 932). Chronic cholecystitis changes were seen in the wall of the gallbladder. (Tr. 932).

On August 3, 2009, plaintiff was seen for a podiatry consult. (Tr. 840). She was diagnosed with Morton neuroma recurring bilaterally in the third interspaces and given an injection. She was to return to the clinic for follow-up in two weeks.

September 2009 pulmonary test results showed moderate obstructive airflow disease. (Tr. 959-61).

State agency reviewing physician Dr. Myung Cho, M.D., completed a physical RFC assessment dated September 30, 2009. (Tr. 735-741A). Dr. Cho opined that plaintiff could perform a limited range of light work activity with environmental restrictions. (*Id.*).

On July 8, 2010, Dr. Judy Kleman, DPM, at the VA Medical Center wrote a letter stating that plaintiff had recently been seen in the podiatry clinic, she had pain in both feet which made it difficult for plaintiff to stand for long periods of time or walk for long distances, she was scheduled for surgery on August 2, and it was not clear if the surgery would alleviate the problem. (Tr. 979).

**B. Mental Impairments**

Plaintiff was admitted to the VA hospital from April 25 to 27, 2001, for severe anxiety with chest pain, non-cardiac. (Tr. 349).

On April 23, 2005, consultative examining psychologist Dr. Richard E. Sexton, Ph.D., evaluated plaintiff and prepared a report. (Tr. 150-154). Plaintiff reported that she consumed

15

a "six-pack" of beer on the weekends. (Tr. 150). Her medications included Clonodine, Percocet, and Valium. (*Id.*). Her flow of conversation and thought processes were normal. (Tr. 151). Her affective mood was somewhat limited, and her demeanor was flat. She acknowledged being depressed. She denied panic attacks and phobic type reactions. Her hypothetical judgment was fair to good. (Tr. 152). She appeared capable of performing personal activities of daily living. Dr. Sexton diagnosed her with dysthymic disorder and anxiety disorder not otherwise specified. (Tr. 153). He assigned her a GAF score of 58 to 62 with the highest score in the past year being 62. Dr. Sexton opined that plaintiff was suffering from "long standing depressive and anxious disorders, with symptoms of these conditions being observed in a variety of behavioral, affective, and cognitive domains." (Tr. 154). He reported that she received anti-anxiety medication for management of her symptoms. He concluded that plaintiff appeared capable of performing simple, repetitive type tasks; she appeared able to understand, recall and carry out simple instructions; her ability to interact with other people, including co-workers and supervisors, appeared to be fair; and her ability to tolerate daily stresses and the pressures of the work environment appeared to be fair.

Plaintiff was seen for a mental health consultation at the VA Medical Center in Chillicothe on May 26, 2005. (Tr. 224). She had last been seen in the mental health clinic in 2001. The provisional diagnoses were dysthymia, anxiety, and hepatitis C+. It was noted that plaintiff had a history of dysthymia with panic attacks and anxiety dating back to 2001. She reported that she was under a lot of pressure from physical problems and had recently received a letter from the SSA informing her that she was going to lose her disability benefits.

Dr. Robert Pittenger, M.D., saw plaintiff in the VA Medical Center for a psychiatric

16

consult on July 14, 2005. (Tr. 225). Plaintiff had been started on Citalopram and Diazepam, and she reported the medications were helping but she was still anxious during the day and was not sleeping well. Dr. Pittenger reported plaintiff was clear thinking, well oriented and "with good humor" insight and judgment, she had no aberrations of thought, and her affect was full. He diagnosed her with mood disorder due to general medical conditions. He continued her Citalopram for "mood" and Diazepam for muscle spasms and anxiety. (*Id.*).

Plaintiff was seen by Dr. Pittenger for follow-up of her psychiatric disorder on October 26, 2005. (Tr. 245). Her mood was dysphoric, apprehensive and tearful. She reported feeling great fatigue and anhedonia. Dr. Pittenger diagnosed plaintiff with severe mood disorder due to general medical conditions.

On February 1, 2006, plaintiff reported that she was nervous all of the time and apprehensive about seeing doctors. (Tr. 242). She also reported that she was going with her father in a camper "to see the races" and would be away for three to four weeks. (*Id.*). Plaintiff was alert and oriented, her speech was normal, her affect was full, her mood was neutral, her thought content was logical and goal directed, and her insight and judgment were intact. The diagnosis was mood disorder due to her general medical condition. Dr. Pittenger increased her Diazepam, noting that was her only psychotropic medication at that time.

In February 2006, Dr. Pittenger reported plaintiff's diagnoses were depression - mood disorder due to general medical conditions, hepatitis C, non-cardiac chest discomfort, hypertension, history of low back pain, and endometriosis. (Tr. 286). He assigned her a GAF

17

score of 50[6] and opined that she was unable to work due to these conditions.

Plaintiff was seen by Dr. Brendan Carroll, M.D., for psychiatric follow-up in the VA clinic on May 11, 2007. (Tr. 382-83). She had no complaints. She was alert and oriented, her speech was normal, her affect was full, her mood was neutral, her thought content was logical and goal directed, and her insight and judgment were intact. Her diagnosis was mood disorder due to general medical condition (arthralgia). Her level of psychosocial stress was noted to be moderate, and her GAF score was currently assessed to be 55. (Tr. 383).

In February 2008, plaintiff reported that her mood had been unstable and that she was still struggling despite having tried most antidepressants. (Tr. 372-73). She was alert and oriented, her speech was normal, her affect was full, her thought content was logical and goal-directed, her mood was neutral, and her insight and judgment were fair. Her diagnosis was depressive order NOS, and she was assigned a GAF score of 60. (Tr. 372).

On May 22, 2008, Dr. Carroll reported that plaintiff was unable to work "due to severe phobic avoidance of people" and that she was unable to seek, obtain or maintain gainful employment. (Tr. 512A-B). Dr. Carroll listed plaintiff's diagnoses as mood disorder due to hepatis B; panic disorder; chest discomfort, non-cardiac; hypertension; hepatitis C; and low back pain. (Tr. 512B). In an undated note, Dr. Carroll stated that plaintiff has multiple medical problems, she is unable to work, she had failed to improve in spite of treatment, and she was unlikely to return to gainful employment for the next five years. (Tr. 511).

At a psychiatric follow-up visit in March 2009, plaintiff reported she was doing well

---

[6]The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000).

on her current psychiatric medications. (Tr. 601). She complained that she got anxious frequently but diazepam helped to calm her down.

On July 9, 2009, consulting examining psychologist Paul A. Deardorff, Ph.D., evaluated plaintiff and prepared a report. (Tr. 710-16). Dr. Deardorff diagnosed major depressive disorder, recurrent, without psychotic features, and panic disorder with agoraphobia. (*Id.*). Dr. Deardorff determined her GAF score fell between 51 and 60 and assigned her a score of 51 in the low end of the range. (Tr. 714). Dr. Deardorff opined that plaintiff was moderately impaired in her ability: to relate to others, including fellow workers and supervisors; to understand, remember and follow simple instructions; and to maintain attention, concentration, persistence and pace. He also opined that plaintiff's ability to withstand the stress and pressure associated with day-to-day work activity is markedly impaired by her emotional difficulties. (Tr. 714-15).

In September 2009, state agency psychologist Patricia Semmelman, Ph.D., reviewed the file and prepared a report. (Tr. 717-34). Dr. Semmelman opined that the VA record "painted an entirely different picture" of plaintiff than did the consultative examiner and the friends of plaintiff, who completed third-party function forms and indicated that plaintiff needed assistance in all areas, she was extremely forgetful, she sees and hears things, and she did not like to talk on the phone or in person. (Tr. 719). Dr. Semmelman found there was nothing in the VA treatment notes that showed any kind of cognitive concerns or problems with speaking. Dr. Semmelman further stated that all the notes show her to be alert and oriented, and a March 3, 2009 note stated that plaintiff reported she was calm with Valium and she was doing well on the medication and expressed no concerns. In addition, Dr.

19

Semmelman noted that the mental status exam at that time was totally intact. Dr. Semmelman also noted that plaintiff was diagnosed with mood disorder NOS due to medical condition, but there were no reports of any panic attacks, and plaintiff was not noted to present in an anxious manner or to have any problems communicating with the staff. (Tr. 719). She found plaintiff would have mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. (Tr. 731).

On February 9, 2010, Dr. Christopher Blank, M.D., saw plaintiff for psychiatric follow-up. (Tr. 881-82). Plaintiff was alert and oriented. Her eye contact was good. Her speech had decreased pitch and prosody but otherwise was within normal limits. Her mood was somewhat dysphoric. Her affect was quite constricted. Her thought processes were linear, logical and goal directed. There were no hallucinations or delusions evident on interviewing her. Insight was fair and judgment was fair to good. Plaintiff reported what Dr. Blank described as "a history of intractable panic attacks meeting full criteria panic disorder with agoraphobia," which had not responded to treatment with medication. On further questioning, plaintiff reported a history of frequent auditory hallucinations of people walking around in her house. She complained of a longstanding history of depression, and on questioning endorsed a history of other symptoms of depression. Dr. Blank recommended medication for her depression and for her "treatment resistant panic attacks." (*Id.*). He found that further questioning revealed "a long history of generalized anxiety and social phobia, as well." (*Id.*). Dr. Blank diagnosed plaintiff with depressive disorder, not otherwise specified, rule out major depressive disorder; anxiety disorder not otherwise specified, probable panic

20

disorder with agoraphobia; psychotic disorder, not otherwise specified, rule out schizoaffective disorder depressive type; generalized anxiety disorder; and social phobia. Dr. Blank adjusted plaintiff's medications and discontinued a medication that he thought may be contributing to her panic attacks. (Tr. 883).

On February 26, 2010, plaintiff was seen in the psychiatric clinic by Dr. Variath, M.D. (Tr. 869-70). Plaintiff reported that Risperdal for psychosis was not helping. (Tr. 869). She described auditory hallucinations as happening in the evening hours "then she has nightmares and she wakes up." (Tr. 869). Dr. Variath noted her past history of alcohol abuse and adjusted her medications.

On May 7, 2010, plaintiff was seen at the psychiatric clinic by a physician's assistant, Mary Williams. (Tr. 852-53). Plaintiff reported her mood had generally been "down" and she thought she occasionally saw people on the steps at home and heard noncommanding voices. (Tr. 852). She reported that the medications she was currently taking were very helpful in calming her. On mental status exam, plaintiff's responses were relevant and coherent, her speech rate and tone were normal, her affect was guarded at times, her mood was very anxious, her concentration and memory were good, her thought process was linear and goal directed, and her thought content that day was without lethality or psychosis.

**V. Analysis**

**A. The ALJ's decision that plaintiff's disability ceased on May 1, 2005 is supported by substantial evidence.**

In his decision dated August 25, 2010, ALJ Temin applied the eight-step analysis applicable to a cessation of benefits. (Tr. 9-27). The ALJ determined, among other findings, that plaintiff had the following medically determinable impairments at the time of the CPD:

21

hepatitis A, B and C, a depressive disorder and musculoskeletal pain (Tr. 11); since May 1,
2005, plaintiff had the following medically determinable impairments: chronic hepatitis C,
degenerative disc disease of the lumbar spine with spondylosis, mild chronic obstructive
pulmonary disease (COPD), depression and anxiety (*Id.*); medical improvement occurred as of
May 1, 2005 (20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i)) (Tr. 16-18); the medical
improvement is related to the ability to work because it has resulted in an increase in
plaintiff's residual functional capacity (Tr. 22); and beginning on May 1, 2005, considering
plaintiff's age, education, work experience, and RFC based on her current impairments,
plaintiff has been able to perform a significant number of jobs in the national economy (20
C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), and 416.966)) (Tr. 25).

Plaintiff apparently concedes that there has been medical improvement in her case.
Plaintiff acknowledges that the ALJ applied the eight-step framework applicable to a
termination of benefits and that he found medical improvement occurred as of May 1, 2005.
(Doc. 27 at 1-3).  However, in arguing that she is entitled to benefits, plaintiff ignores the
eight-step sequence.  Plaintiff instead sets forth the five-step framework that applies when an
individual seeks an initial award of benefits and contends that since she cannot perform any
substantial gainful activity, the ALJ's decision is clearly wrong and should be reversed.  (Doc.
27 at 11-12).  Plaintiff does not address anywhere in her Statement of Errors whether the ALJ
erred by finding medical improvement.  Thus, it appears plaintiff is contesting only the denial
of her new claims for SSI and DIB which were filed on April 1, 2009.

Even assuming plaintiff were challenging the ALJ's decision as to the cessation of
benefits, the Court finds upon review of the medical evidence of record that the ALJ's

22

decision should be upheld in this respect. Substantial evidence supports the ALJ's decision

that there has been medical improvement in plaintiff's medical condition, other than

improvement that is not related to her ability to work, between the date of ALJ Kelly's

favorable determination on November 22, 2000 (the CPD), and the date of the most recent

ALJ hearing, which was July 19, 2010.

     In the initial disability determination, ALJ Kelly found plaintiff was unable to perform

substantial gainful activity due in part to severe hepatitis A, B and C and the residuals and

symptoms resulting from her hepatitis. (Tr. 36). ALJ Kelly determined that plaintiff would

suffer from diminished stamina and endurance due to symptoms of fatigue, chronic pain and

depression, causing her to miss two to three days of work per month. (Tr. 36). ALJ Kelly

specifically relied on evidence that plaintiff had been hospitalized numerous times for

hepatitis and its resulting symptoms and for depression. (*Id.*).

     In the August 25, 2010 ALJ decision, ALJ Temin determined there had been medical

improvement as of May 1, 2005, pursuant to 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i).

(Tr. 16). ALJ Temin determined the medical evidence supported a finding that there had been

a decrease in the medical severity of plaintiff's impairments (hepatitis A, B, and C, a

depressive disorder, and musculoskeletal pain) present at the time of the CPD (Tr. 11) as of

May 1, 2005. (Tr. 16). In making this determination, ALJ Temin compared the "prior and

current medical evidence" as required by the regulations and reasonably determined based on

the medical evidence of record that plaintiff's symptoms had decreased in severity. *See* 20

C.F.R. §§ 404.1594(c)(1), 416.994(b)(2)(i). ALJ Temin found that plaintiff has continued to

suffer from chronic hepatitis C since May 1, 2005, and he noted in his decision positive

laboratory findings indicating chronic hepatis. (Tr. 12, 17). However, ALJ Temin found that whereas at the CPD plaintiff had fatigue, depression, and "frequent hospitalization," she had not had any recent hospitalizations; the records did not show a significant problem with fatigue since the cessation date and fatigue was rarely mentioned; and the source of plaintiff's pain was unclear even though she received methadone for musculoskeletal pain. (Tr. 18). ALJ Temin's findings are substantially supported by the record.

In contrast to the frequent number of hospitalizations plaintiff experienced shortly after her hepatitis diagnosis in 1998 and prior to ALJ Kelly's decision, there is no evidence that plaintiff was ever hospitalized for hepatitis or any resulting symptoms subsequent to the CPD. Nor is there any evidence that plaintiff sought treatment at a pain clinic or similar facility for symptoms of hepatitis. In addition, medical evidence that plaintiff continued to suffer from disabling fatigue is lacking. In her Statement of Errors, plaintiff notes one self-report of fatigue during a mental health visit on October 26, 2005 (Doc. 27 at 14, citing Tr. 245), but she does not point to any other complaints of fatigue in the medical records. Accordingly, substantial evidence supports the ALJ's finding that plaintiff's hepatitis decreased in medical severity.

Substantial evidence also supports a finding that there has been medical improvement in plaintiff's disabling pain as of May 1, 2005. ALJ Temin reasonably relied on a lack of evidence showing a disabling musculoskeletal impairment to find medical improvement in this respect. The ALJ found there was "relatively little evidence" pertaining to plaintiff's musculoskeletal problems and what evidence exists does not support plaintiff's allegations that she is unable to work. (Tr. 16). The x-ray and MRI results were normal for the shoulders

24

and revealed no bone deformities or disc space abnormalities of the back. (*Id.*, citing Tr. 316, 318). In addition, plaintiff received only conservative care and treatment for her chronic pain, consisting primarily of pain medication. Plaintiff had neither been hospitalized for any musculoskeletal impairment, nor had she undergone surgery for any such impairment. While plaintiff was treated by a chiropractor in 2008 for neck, left shoulder, lower back, and bilateral ankle pain, the chiropractor's records describe plaintiff's symptoms as acute and improved within a few weeks. (Tr. 493, 501). These findings support the ALJ's determination that there was medical improvement in plaintiff's medical condition as of May 1, 2005.

Finally, substantial evidence supports ALJ Temin's finding that there has been medical improvement in plaintiff's depression. ALJ Kelly previously found that plaintiff would be absent from work two to three days a month at unpredictable times due to symptoms of fatigue and/or depression. (Tr. 36). ALJ Kelly stated that plaintiff was hospitalized in October 1999 due to depression secondary to her general medical condition and was assigned a GAF score of 52; she was hospitalized again due to her depressive disorder in February 2000; and she was hospitalized a third time in May 2000. (*Id.*). However, as ALJ Temin noted, plaintiff has not had any recent hospitalizations for depression since the CPD. (Tr. 18). Moreover, she apparently did not undergo mental health treatment once she started receiving disability benefits, but she instead began treatment only after learning her benefits would cease. (Tr. 17, citing Tr. 224). The GAF scores assigned by different examining and treating psychologists after plaintiff started treatment showed only moderate symptoms. (*See* Tr. 17-18, citing Tr. 150-154- GAF score of 58-62 assigned in 4/05; Tr. 383- GAF score of 55 assigned in 5/07; Tr.

372- GAF score of 60 assigned in 2/08; and Tr. 710-716- GAF score of 51 assigned in 7/09)[7].

In addition, ALJ Temin reasonably found there was no evidence of significant anxiety other

than when plaintiff was around medical providers. (*Id.*). The record evidence shows that

plaintiff's mental status examinations were normal in March, June and October of 2009, and

that she was doing well with medications that helped calm her down. (Tr. 17, citing Tr. 601-

02, 898, 952). ALJ Temin reasonably relied on plaintiff's record of hospitalizations for

depression prior to the CPD and compared it to evidence showing that she did not begin

mental health treatment again until after she learned her social security benefits would be

terminated and evidence that her symptoms subsequent to the CPD decreased in severity in

finding medical improvement as of May 1, 2005.

　　　In addition to failing to challenge the ALJ's finding as to medical improvement,

plaintiff likewise fails to challenge the ALJ's finding that plaintiff's medical improvement is

related to the ability to work because it resulted in an increase in plaintiff's RFC. (Tr. 22). In

any event, as explained below in connection with the Court's analysis of plaintiff's specific

assignments of error, the ALJ's decision finding an increase in plaintiff's RFC is supported by

substantial evidence.[8] Plaintiff does not challenge the ALJ's findings at the remaining steps of

the cessation of benefits analysis. For the reasons set forth above, the ALJ's decision on the

termination of benefits is supported by substantial evidence and should be affirmed.

---

[7]As noted earlier, these scores all fall in the moderate range of symptoms. *See supra* p. 7, n. 1.

[8]Plaintiff argues that the ALJ erred by not giving controlling weight to the opinion of Dr. Chinnappan in connection with her second assignment of error, wherein she claims that the limitations Dr. Chinnappan imposed would preclude her from performing any substantial gainful activity. (Doc. 27 at 14). The Court finds for the reasons discussed below in connection with plaintiff's second assignment of error that the ALJ did not err by failing to give controlling weight to Dr. Chinnappan's opinion.

**B. The ALJ's decision that plaintiff has not become disabled again since May 1, 2005 is supported by substantial evidence.**

The remaining issue to be resolved is whether the ALJ's finding that plaintiff is not

disabled based on her new applications for SSI and DIB filed on March 3, 2009 is supported

by substantial evidence.  To qualify for disability benefits, a claimant must suffer from a

medically determinable physical or mental impairment that can be expected to result in death

or that has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI).  The impairment must render the

claimant unable to engage in the work previously performed or in any other substantial gainful

employment that exists in the national economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential

evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)

27

(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four steps of the

sequential evaluation process.  *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir.

2004).  Once the claimant establishes a prima facie case by showing an inability to perform

the relevant previous employment, the burden shifts to the Commissioner to show that the

claimant can perform other substantial gainful employment and that such employment exists

in the national economy.  *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

On appeal from the denial of her new claims for SSI and DIB, plaintiff argues that: (1)

the ALJ failed to properly consider the combined impact of plaintiff's impairments; (2) the

ALJ improperly dismissed the findings of the treating source, Dr. Chinnappan; and (3) the

ALJ did not adequately consider plaintiff's pain and credibility.

### 1. The ALJ properly considered the combined effect of plaintiff's impairments.

Plaintiff alleges that the ALJ failed to consider the combined effect of her

impairments.  (Doc. 27 at 12-13).  Plaintiff contends that the ALJ did not take into account the

significant limitations imposed by her hepatitis, back condition, foot condition, depression,

and anxiety.  (*Id.* at 13).  Plaintiff also asserts that the ALJ did not consider her foot condition

at all and failed to "fully" consider her fatigue, anxiety and depression.  (*Id.* at 12).  Plaintiff's

arguments are not well-taken.

In assessing a claim for disability, the ALJ must analyze "the combined effect of all of

the claimant's impairments without regard to whether any such impairment, if considered

separately, would be of sufficient severity to render the claimant disabled." *Walker v. Sec. of

Health & Human Servs.,* 980 F.2d 1066, 1071 (6th Cir. 1992).  This does not mean the ALJ

28

must employ a particular "combined effects" analysis. *See Loy v. Sec. of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir.1990). "[A]n ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effects of the impairments in combination, where the ALJ specifically refers to a combination of impairments in finding that the plaintiff does not meet the listings." *Id.* (citing *Gooch v. Secretary of HHS*, 833 F.2d 589, 592 (6th Cir. 1987)).

Here, the ALJ analyzed, in detail, plaintiff's impairments individually and determined that since May 1, 2005, plaintiff suffers from severe chronic hepatitis C, degenerative disc disease of the lumbar spine with spondylosis, mild chronic obstructive pulmonary disease (COPD), depression, and anxiety. (Tr. 11-15). The ALJ also determined that while the record contains evidence of treatment for other conditions, including a foot condition (bilateral morton neuroma), there was no substantial evidence that these other impairments were severe. (Tr. 15). The ALJ went on to consider plaintiff's impairments "individually and in combination" and determined that plaintiff "has not had an impairment or combination of impairments" that meets or medically equals a listed impairment. (*Id.*). In assessing plaintiff's RFC, the ALJ considered both plaintiff's physical and mental impairments and accommodated the limitations from these impairments by restricting plaintiff to less than a full range of light work activity with no interaction with the general public or no more than simple work-related decisions, among others. (Tr. 18). Throughout his decision, ALJ Temin referred to plaintiff's "impairments" and stated that he reached his decision after "consideration of the entire record." *See Gooch*, 833 F.2d at 592 (combination of impairments considered where ALJ decision reflected "consideration of the entire record " and specific findings regarding

29

plaintiff's "impairments"). It is sufficient that the ALJ to referred to plaintiff's "impairments" (plural) and "combination of impairments" to show that he considered the combined effect of plaintiff's impairments. *Loy*, 901 F.2d at 1310. The ALJ's decision amply demonstrates that plaintiff's mental and physical impairments were considered collectively.

In addition, and contrary to plaintiff's assertion, the ALJ specifically acknowledged that plaintiff had been treated for a foot condition, bilateral morton neuroma. (Tr. 15). Nevertheless, the ALJ found there was no evidence plaintiff's foot impairment resulted in more than minimal functional limitations. (Tr. 15). This finding is substantially supported by the record. After plaintiff was diagnosed with bilateral morton neuroma[9] (Tr. 840), she was treated conservatively with lidocaine injections and foot orthotics. (Tr. 840, 879). Yet, it was not until July 2010 that a physician reported any alleged limitations resulting from foot pain. (Tr. 979). Thus, there is no evidence that plaintiff's foot impairment significantly limited her ability to perform basic work-related activities for twelve consecutive months as required under 42 U.S.C. §§ 423(d)(1)(a) and 1382c(a)(3)(A). The ALJ's decision in this regard is not in error.

In sum, the ALJ did not fail to "even mention the foot impairment in his analysis" as plaintiff contends and did not fail to properly consider the combined impact of plaintiff's physical and mental impairments. Plaintiff's first assignment of error should be overruled.

---

[9]"Morton's neuroma is a painful condition that affects the ball of [the] foot, most commonly the area between [the] third and fourth toes." *See* http://www.mayoclinic.com/health/mortons-neuroma/DS0046. The feeling resembles "standing on a pebble in [the] shoe or on a fold in [the] sock." *Id.* The condition "involves a thickening of the tissue around one of the nerves leading to [the] toes" and may cause "a sharp, burning pain in the ball of [the] foot." *Id.* "Common treatments for Morton's neuroma include changing footwear or using arch supports. Sometimes corticosteroid injections or surgery may be necessary." *Id.*

## 2. The ALJ did not improperly dismiss the findings of plaintiff's treating physician in assessing plaintiff's RFC.

Plaintiff alleges as her second assignment of error that the ALJ erred by dismissing the opinion of her treating physician, Dr. Chinnappan. (Doc. 27 at 14-15). Plaintiff contends that Dr. Chinnappan's findings are supported by the medical records, including those of plaintiff's podiatrist, Dr. Kleman (Tr. 979); lab results showing her liver enzymes were improved but elevated in July 2005 (Tr. 252) and that her hepatitis treatment had not cleared the virus in February 2006 (Tr. 241); and March 2008 imaging results that purportedly document her back pain (Tr. 315-16). (*Id.* at 14-15). Plaintiff further argues that the ALJ should have given at least "some weight" to the decisions of Dr. Pittenger and Dr. Carroll, the other treating physicians who stated she was disabled. (*Id.* at 15, citing Tr. 286 and 511-512B).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-530 (6th Cir. 1997). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a non-examining medical advisor. *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987).

The treating physician rule mandates that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing former 20 C.F.R. § 404.1527(d)(2)). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-

31

(6) and 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Wilson*, 378

F.3d at 544.  These factors are the length, nature and extent of the treatment relationship and

the frequency of examination, how well-supported by evidence the opinion is, how consistent

the opinion is with the record as a whole, the medical specialty of the source, and other factors

which tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(3)-(6);

416.927(c)(3)-(6); *Wilson*, 378 F.3d at 544.  In accordance with this rule, the ALJ must give

"good reasons" for the ultimate weight afforded the treating physician opinion, based on the

evidence in the record, and the reasons must be sufficiently specific to enable meaningful

review of the ALJ's decision. *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)

(citing 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96–2p, 1996 WL 374188, at *5;

*Wilson*, 378 F.3d at 544).

Here, ALJ Temin gave "good reasons" for not giving the most or controlling weight to

Dr. Chinnappan's opinion that plaintiff was limited to standing 2 hours in an 8-hour day and 1

hour at a time, sitting 2 hours in an 8-hour day and 15-20 minutes at a time, and

lifting/carrying 5 pounds for 1 hour a day (Tr. 516-518).  In affording "little weight" to Dr.

Chinnappan's opinion, the ALJ explained that Dr. Chinnappan's assessment contained no

objective support; the objective medical evidence in the file did not support limitations as

great as those Dr. Chinnappan imposed; and the extent of Dr. Chinnappan's contact with

plaintiff was unclear.  (Tr. 21).

The ALJ's reasons for discounting Dr. Chinnappan's opinion are substantially

supported by the record.  Dr. Chinnappan's assessed limitations were perfunctory, and he

declined to set forth any medical findings in support of his assessment as requested on the

32

form he completed. (Tr. 516-518). Therefore, the record fails to reflect the clinical or objective basis for the limitations he imposed. In addition, no other physician of record imposed such extreme functional limitations. While two other physicians at the VA Medical Center, Drs. Pittenger and Carroll, gave opinions that plaintiff is "unable to work" (Tr. 286, 511), they did not address any specific functional limitations. Moreover, their conclusory opinions that plaintiff is disabled are not entitled to any weight. *See Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004) (disability determination is ultimately the prerogative of the Commissioner, not the treating physician); 20 C.F.R. §§ 404.1527(d), 416.927(d).

The medical evidence cited by plaintiff does not show that the ALJ erred by discounting Dr. Chinnappan's opinion. (Doc. 27 at 14-15). Plaintiff cites a letter from Dr. Kleman regarding plaintiff's foot impairment (Tr. 979), but the letter is dated July 2010, which post-dates Dr. Chinnappan's June 2008 assessment by more than two years and cannot form the basis for Dr. Chinnappan's opinion that plaintiff is limited in her standing and walking. Moreover, the March 2008 lumbar spine MRI results cited by plaintiff do not disclose findings that support the extreme functional limitations imposed by Dr. Chinnappan as the MRI revealed only "minor degenerative disc disease." (Tr. 316). Finally, plaintiff's single citation to complaints of fatigue on one occasion in October 2005 (Doc. 27 at 14, citing Tr. 245) fails to support the limitations Dr. Chinnappan imposed. Plaintiff points to no other evidence in the record showing fatigue was a persistent or chronic problem that limited plaintiff's functional abilities. Even if the evidence cited by plaintiff would support a finding of disability, the Court must uphold the ALJ's decision to discount Dr. Chinnappan's opinion

in assessing plaintiff's RFC where, as here, it is supported by substantial evidence. *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).

For these reasons, the ALJ did not violate the Social Security regulations and rulings in deciding the weight to afford the opinions of plaintiff's treating physicians. The ALJ gave "good reasons" for discounting Dr. Chinnappan's assessment and the decision to afford the assessment "little weight" is substantially supported by the record. The ALJ was not bound by the opinions of Drs. Pittenger and Carroll that plaintiff is unable to work and he reasonably decided not to afford these conclusory statements any weight. The ALJ's decision that plaintiff does not have the extreme functional limitations found by Dr. Chinnappan is supported by substantial evidence. Plaintiff's second assignment of error should be overruled.

### 3. The ALJ's credibility finding is supported by substantial evidence.

Plaintiff alleges as her third assignment of error that the ALJ did not adequately consider plaintiff's pain and credibility in accordance with the Social Security regulations. (Doc. 27 at 16-17). The ALJ's credibility determination must include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional

34

limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96–7p.

In this case, the ALJ determined that plaintiff's overall credibility is poor. (Tr. 20). The ALJ noted the inconsistencies between plaintiff's testimony at the hearing and her reports to her medical providers; her history of largely conservative treatment for musculoskeletal pain; her commencement of mental health treatment only after she learned her disability benefits would be terminated; her continued use of alcohol despite the contraindication to therapy for Hepatitis C[10]; and her drug seeking behavior. (Tr. 20).

Plaintiff first alleges that the ALJ clearly erred by relying on her "continue[d] diminished drinking for a time after her diagnosis" as a reason to deny her benefits. (Doc. 27 at 16). Plaintiff contends that the ALJ falsely assumed that she continued to drink when the medical records reflecting her alcohol consumption are from 2005 (*Id.*, citing Tr. 153, 230) and the more recent records do not reflect continued alcohol consumption. Plaintiff asserts that continued alcohol consumption does not negate her allegations of significant pain. (Doc. 27 at 16).

The ALJ determined that plaintiff's "allegations of disabling Hepatitis C are called into question by her extensive alcohol use after her diagnosis. . . ." (Tr. 20). Plaintiff's use of alcohol after her Hepatitis C diagnosis was one of several factors the ALJ considered in assessing plaintiff's credibility. Plaintiff continued to consume alcohol despite her knowledge of the adverse effects on her liver functioning and treatment for Hepatitis C. (Tr. 230, 245,

---

[10]"Active alcohol intake is considered a relative contraindication to interferon-based therapy." Hepatitis C and Alcohol, http://www.hepatitis.va.gov/provider/reviews/alcohol.asp.

248, 265). Plaintiff was still drinking alcohol in April 2005 (Tr. 150), October 2005 (Tr. 248), and November 2005 (Tr. 115-17), and records subsequent to 2005 show plaintiff continued to consume alcohol, contrary to plaintiff's contention. In August 2006, plaintiff was taken off her narcotic pain medications for six months as a result of her continued alcohol consumption. (Tr. 396, 399-400). In April 2008, plaintiff reported to her physician that she had "not used alcohol for about four months" (Tr. 366), indicating she continued to use alcohol in early 2008. The ALJ could reasonably determine that plaintiff's continued alcohol consumption after her Hepatitis C diagnosis was inconsistent with someone alleging disabling fatigue and pain from this impairment, especially when alcohol consumption resulted in the withdrawal of the pain medication plaintiff purportedly relied on to treat her "significant" pain.

Next, plaintiff argues the ALJ failed to properly consider her allegations of back, leg, and side pain, fatigue, and breathing problems. (Doc. 27 at 17). Plaintiff points to her own subjective testimony as evidence confirming the extent of her alleged limitations and pain. Plaintiff refers to back, leg and side pain; foot pain that was relieved by elevating the foot at times; and fatigue. (Doc. 27 at 17). She reports she had trouble breathing at times. (*Id.*). However, such subjective evidence does not satisfy the test for evaluating a claimant's pain or other symptoms and cannot alone support a finding of disability. *See* 42 U.S.C. § 423(d)(5)(A). *See also Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852 (6th Cir. 1986); 20 C.F.R. §§ 404.1529(b), 416.929(b).

While plaintiff claims her testimony is in line with the findings of all of her treating physicians, she does not point to objective or clinical findings by these physicians showing her medical impairments are so severe that they could reasonably be expected to produce

36

disabling pain and fatigue. *Duncan*, 801 F.2d at 853-54. In contrast, the ALJ reasonably noted that plaintiff has received conservative care and treatment and her functioning, as demonstrated by the medical evidence, was significantly better than she alleged at the hearing. (Tr. 24). The ALJ reviewed the medical evidence relating to plaintiff's COPD; he noted that she continues to smoke despite her condition; and he found that she has given inconsistent statements as to the amount she smokes. (Tr. 23, citing Tr. 933A, 916, and testimony at ALJ hearing). And although plaintiff continues to suffer from chronic hepatitis, the record does not support a significant problem with fatigue. (Tr. 20). The ALJ reasonably relied on the absence of imaging test results and clinical findings showing an orthopedic condition that could reasonably be expected to produce pain of the frequency, severity, and duration plaintiff described. (Tr. 24). The ALJ had an adequate basis to conclude that plaintiff's objectively established medical condition was not so severe that it could reasonably be expected to produce disabling pain or other symptoms. *See Duncan*, 801 F.2d at 853-54.

Plaintiff also contends that her allegations regarding her mental impairments are supported by evidence in the record, specifically by a February 2010 VA treatment note diagnosing social phobia and the need to rule out schizoaffective disorder. (*Id*. at 16-17). She contends her complaints about her social and mental impairments should have been found credible. (Tr. 17).

The ALJ acknowledged plaintiff's complaints of disabling anxiety, but determined the record failed to support plaintiff's allegations. (Tr. 20). The ALJ's decision in this regard is substantially supported by the record. As the ALJ reasonably noted, despite plaintiff's claims of disabling mental impairments, she did not resume any mental health treatment until she

37

learned her Social Security benefits would cease. (Tr. 20, citing Tr. 224). In addition, the record does not support plaintiff's complaints of disabling anxiety and social phobia. The ALJ reasonably found that plaintiff's actions were inconsistent with allegations of disabling anxiety and a dislike of being around others. In this regard, the ALJ noted that plaintiff claimed she was too nervous to drive, but drove to an examination in March 2006. (Tr. 20, citing Tr. 352). In addition, while she claimed a "severe phobic avoidance of people" (Tr. 21, citing Tr. 512B), the record shows plaintiff obtained an early refill of her prescription medication because she was leaving town for one month to go to the races, which was inconsistent with complaints of disabling anxiety and social phobia. (*Id.*, citing Tr. 236). Also, plaintiff's GAF scores consistently showed only moderate symptoms. *See supra* at pp. 25-26. The ALJ's credibility determination was permissible in light of the inconsistencies between the objective evidence and plaintiff's testimony. The ALJ properly discounted plaintiff's credibility where, as here, there are contradictions among the medical records, plaintiff's testimony, and other evidence. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004). The Court has no basis for disturbing the ALJ's credibility determination and must defer to the ALJ's finding. Plaintiff's third assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 10/9/2012

Karen L. Litkovitz
United States Magistrate Judge

38

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KELLI FIELDS,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:09-cv-273
Spiegel, J.
Litkovitz, M.J.

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy

of the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court

on timely motion for an extension.  Such objections shall specify the portions of the Report

objected to and shall be accompanied by a memorandum of law in support of the objections.

If the Report and Recommendation is based in whole or in part upon matters occurring on the

record at an oral hearing, the objecting party shall promptly arrange for the transcription of the

record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems

sufficient, unless the assigned District Judge otherwise directs.  A party may respond to

another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure

to make objections in accordance with this procedure may forfeit rights on appeal. *See*

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).